[Cite as *In re A.V.*, 2022-Ohio-4719.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| A.V., et al. | : | CASE NOS.  CA2022-06-046 |
| | | CA2022-06-047 |
| | : | CA2022-06-048 |
| | | CA2022-06-049 |
| | : | |
| | | O P I N I O N |
| | : | 12/28/2022 |
| | | |
| | : | |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 22 -D000019, 22- D000020, 22-D000021; 22-D000022

Father, pro se.

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten Brandt, Assistant Prosecuting Attorney, for appellee.

Andrea G. Ostrowski, guardian ad litem.

**S. POWELL, J.**

{¶ 1}   Appellant, the biological father of the four children at issue in this case, A.V., E.V., I.V., and O.V., appeals the decision of the Warren County Court of Common Pleas, Juvenile Division, adjudicating the children as dependent under R.C. 2151.04(C).  For the reasons outlined below, we affirm.

**Facts and Procedural History**

{¶ 2}   On August 26, 2020, Warren County Children Services ("WCCS") filed a complaint alleging the four above-named children, who were then between the ages of eight and 14 years old, were dependent under R.C. 2151.04(C) and moved for temporary custody.  An adjudication hearing was held before a juvenile court magistrate on October 21 and 28, 2020.  During this hearing, both Father and the children's mother admitted to using drugs in the time leading up to when WCCS filed its complaint.  Father and Mother claimed, however, that they were no longer using drugs and were now in active recovery.  A WCCS caseworker also testified that the children were doing well in school, that the children's basic and medical needs were being met, that the children's housing was appropriate, and that the children had denied any knowledge of their parents' drug use.

{¶ 3}   On November 2, 2020, the magistrate issued a decision finding by clear and convincing evidence that the children were dependent under R.C. 2151.04(C) and awarded temporary custody of the children to WCCS.  In so holding, the magistrate noted that both Father and Mother admitted drug use in the time leading up to when WCCS filed its complaint.  Father filed objections to the magistrate's decision.  In support of his objections, Father argued that the state had failed to show his and Mother's drug use had an adverse impact on the children that would allow for state intervention under R.C. 2151.04(C).  The juvenile court overruled Father's objections and affirmed and adopted the magistrate's decision in its entirety.  Father subsequently appealed the juvenile court's decision to this court.

{¶ 4}   In a unanimous decision, this court reversed the juvenile court's decision upon finding the state had failed to prove Father's and Mother's drug use had an adverse impact

upon the children to warrant state intervention under R.C. 2151.04(C). *In re A.V.*, 12th Dist. Warren Nos. CA2021-04-030 thru CA2021-04-033, 2021-Ohio-3873. In so holding, this court stated:

> We recognize that a parent's drug use may or can result in environmental risks to his or her children. However, to warrant state intervention under R.C. 2151.04(C), a negative consequence must be shown "to have an adverse impact upon the child[.] That impact cannot be simply inferred in general, but must be specifically demonstrated in clear and convincing manner." *In re Burrell*, 58 Ohio St.2d [37, 39 (1979)]. Such was not the case here as the record is devoid of any evidence demonstrating that Mother's and Father's drug use had an adverse impact on their children. Without some evidence that the children's environment has been affected in some negative way by Mother's and Father's drug use, there is no clear and convincing evidence of dependency.

*Id.* at ¶ 28. This court did note, however, that our decision could have been different had the state established "some other predicate showing dependency" beyond just Father's and Mother's past drug use. *Id.* at ¶ 29.

{¶ 5} On March 8, 2022, WCCS filed a new complaint that again alleged the children, who were now between the ages of ten and 16 years old, were dependent under R.C. 2151.04(C) and moved for temporary custody.[1] To support its newly filed complaint, WCCS argued that it was in the children's best interest to remain in foster care given the ongoing concerns regarding Mother's "protective capacities," extensive history with drugs, and positive drug screen. WCCS argued this was also because of the "numerous concerns" regarding Father that had since come to light after it filed its original complaint in the summer of 2020. For instance, although Father had previously reported that his drug use was only

---

1. We note that because each of the four children were given different case numbers, WCCS had in actuality filed four complaints rather than just one. However, for ease of discussion and because the filings are nearly identical in all four cases, we will treat each of the four children as if they all fell under the same case number throughout this opinion.

- 3 -

"social, not in front of the children, that they did not know about it, and it had no impact on the children," WCCS alleged that it now knew "the children were aware of the parents' drug use, it occurred more than the few times Father claimed, and one child was engaging in cutting (self-harming behaviors)."

{¶ 6} WCCS also alleged that the children had "disclosed many troubling situations that they experienced while living with their parents that negatively affected them." This included the children reporting to WCCS that "money was a concern" for the family and that "there were times no food was in the house." WCCS alleged that this was in addition to its concerns that Father had twice exercised his Fifth Amendment right against self-incrimination when "questioned under oath by a probate court" about "how his business operates" and about "one particular case/claim" brought against him that ultimately resulted in Father personally paying the victim a sum totaling $40,000.

{¶ 7} WCCS further alleged that it had concerns regarding Father's ongoing and untreated mental health issues. WCCS noted that these concerns stemmed from Father having not satisfactorily completed mental health counseling to address his "personality characteristics." WCCS also noted that Father had not completed a domestic violence assessment, outpatient substance abuse treatment, or an intensive parenting education program as recommended following Father's psychological evaluation conducted by CDC Behavioral Health Services ("CDC").

{¶ 8} WCCS additionally noted that Father had refused to submit to any drug screens in nearly a year and that Father's parenting time with the children had been suspended due to his "non-compliance" and "unwillingness" to address these concerns, "all of which affect the minor child[ren] (and have in the past)."

- 4 -

{¶ 9} On March 25, 2022, the juvenile court held an emergency shelter care hearing.[2] Neither Father nor Mother appeared at this hearing despite both receiving notice of the hearing in multiple different forms. This included, in addition to the standard forms of notice, the juvenile court leaving a voicemail for Father in the voicemail inbox associated with Father's telephone number and by sending Father an e-mail to Father's e-mail address. Following this hearing, the juvenile court issued a decision finding it was in the children's best interest to remain in foster care. In so holding, the magistrate determined that returning the children to Father's and Mother's custody would be contrary to the children's general welfare and that continued removal of the children from their parents' care was necessary.

{¶ 10} On May 24, 2022, the juvenile court held an adjudication hearing for each of the four children. During this hearing, Mother stipulated that the children were dependent under R.C. 2151.04(C). Father, however, did not so stipulate. Father also refused the juvenile court's request to submit to a drug screen unless he would "get [his] kids back" immediately thereafter. Father further objected to the hearing going forward claiming it was "violation of a lot of procedural due process." Despite Father's objection, the hearing proceeded as scheduled with testimony from three witnesses: CDC psychology assistant Timothy Brannigan, Sr.; Father, as if on cross-examination; and WCCS caseworker Kyla New. The following is a summary of the testimony offered by these three witnesses in the order in that they testified.

---

2. The emergency shelter care hearing held on March 25, 2022 was, in fact, a rehearing in accordance with Juv.R. 7(G) given Father's motion filed on March 23, 2022 alleging he had not received notice of the original March 8, 2022 hearing. Pursuant to Juv.R. 7(G), "[i]f a parent, guardian, or custodian did not receive notice of the initial hearing and did not appear or waive appearance at the hearing, the court shall rehear the matter promptly." Juv.R. 7(G) also provides that, "[a]fter a child is placed in shelter care or detention care, any party and the guardian ad litem of the child may file a motion with the court requesting that the child be released from detention or shelter care. Upon the filing of the motion, the court shall hold a hearing within seventy-two hours."

*Brannigan's Testimony*

**{¶ 11}** Brannigan, an expert witness who has been trained to perform psychological, substance abuse, and mental health evaluations, testified that he received a referral to do a psychological evaluation of Father. Brannigan testified that as part of that evaluation process Father signed various releases of information—releases that Father subsequently rescinded after he received the results of his psychological evaluation—that were generally kept in a paper file located in CDC's office area. Brannigan testified this paper file would have also included the original signed copy of Father's psychological evaluation.

**{¶ 12}** Brannigan testified, however, that he no longer had that paper file because Father stole the file from CDC's office. Brannigan testified that, based on his review of CDC's security camera footage, Father did this by reaching through CDC office's receptionist's area, grabbing the file, turning, and then exiting from the CDC office with the file in hand. When asked if Father was entitled to take that file from CDC's office, Brannigan testified, "No, he was not." Brannigan also testified that a police report detailing the theft had been made.[3]

**{¶ 13}** Brannigan testified that although the original signed copy of Father's psychological evaluation was no longer available, CDC was still able to send an unsigned copy of that evaluation to WCCS prior to Father rescinding the releases of information that Father had signed previously. Brannigan was then provided with a document that he identified as a true and accurate copy of Father's unsigned psychological evaluation that

---

3. We note that Brannigan later clarified his testimony by noting that Father was entitled to copies of certain documents contained within that file, but not to the entire physical paper file itself. Brannigan testified that the decision of what documents a requesting individual is entitled to receive copies of is a decision that is left to the primary clinician who determines what records are "appropriate to be given."

CDC had sent to WCCS.[4]  Without any objection from Father, Brannigan testified about the findings set forth within Father's psychological evaluation.  As part of those findings, Brannigan testified that Father had exhibited a "limited understanding" of how his use of drugs, anger issues, and incidents of domestic violence "have led to ongoing concerns and his functioning," as well as the impact that his conduct may have on the children.

{¶ 14} Brannigan also testified that he had concerns Father may not have been forthright during the evaluation, that Father appeared to be reluctant to admit most common shortcomings that most other individuals would freely acknowledge, and that Father may be suffering from a personality disorder, which if left untreated could result in Father having "difficulty in all forms of interpersonal relationships."  Brannigan further testified that Father believed he had no difficulty with his anger, which means Father "does not find it a problem."  Brannigan testified this was a concern because "typically when individuals don't believe that they have a problem, they don't believe that it's an area that needs to be addressed."

{¶ 15} Brannigan additionally testified that standardized testing revealed that Father was a moderate risk for future abuse or neglect of the children, thereby indicating Father could benefit from an intensive parenting education program.  Brannigan testified that this was in addition to Father completing a domestic violence assessment, outpatient substance abuse treatment, mental health counseling, and submitting to random drug screens.

*Father's Cross-Examination Testimony*

{¶ 16} Father testified that, although he was aware of the recommendations set forth within his psychological evaluation, he had intentionally not completed an intensive

---

4. Brannigan was eventually able to retrieve a scanned .pdf copy of the signed version of Father's psychological evaluation by searching through his old e-mails.  Except for the inclusion of a signature and correction of small typographical errors, the signed and unsigned versions of Father's psychological evaluation are identical to the diagnostic impressions, the diagnosis provided, and the recommendations made therein.

parenting education program, domestic violence assessment, outpatient substance abuse treatment, or mental health counseling. Father also testified that he had not agreed to submit to any random drug screens requested by WCCS in over a year. Father testified the same was true as it relates to any random drug screen offered by the juvenile court. Father testified that this was because of this court's prior decision in *In re A.V.*, 2021-Ohio-3873 that Father claimed "reversed and vacated everything."

**{¶ 17}** Father then testified and admitted that the juvenile court had ordered him not to have any contact with the children, but that he had nonetheless knowingly violated that order by visiting with the children while the children were with Mother.[5] Father additionally testified and admitted to both calling and text messaging with the children in violation of the juvenile court's no contact order, claiming that it was "in accordance to [his] liberty of being a parent." Father also admitted that he had knowingly violated a protection order that Mother had taken out against him and that he had previously gone to Mother's work unannounced and, once there, took Mother's car without permission.

**{¶ 18}** Father further testified that he did not believe the juvenile court had jurisdiction over him. Explaining why this was, Father testified, "I have not entered into any kind of contract with this. I've revoked all contracts." Father additionally testified that he had asked both WCCS and the juvenile court "to kindly disclose to me how I'm under this jurisdiction, and I haven't gotten an answer, so…"[6] Father also testified that "it depends" on whether

---

5. Father also admitted to contacting A.V. by sending A.V. flowers and more recently to contacting A.V. to return A.V.'s computer that he had agreed to fix.

6. We note that Father's testimony, as well as several of Father's filings, make claims substantially similar to those "sovereign citizen" arguments that have been roundly rejected as lacking any merit and patently frivolous. For a general overview of such arguments, *see* University of North Carolina at Chapel Hill School of Government, *A Quick Guide to Sovereign Citizens* (Rev. Nov. 2013),

he believes the juvenile court's orders should apply to him. Father instead testified that he would follow the juvenile court's orders only to "an extent" so long as juvenile court's orders are "not repugnant to the Constitution, yeah."

*New's Testimony*

**{¶ 19}** New testified that she had developed a relationship with the children during the two years she had worked on Father's and Mother's case. New testified that this relationship had grown to the point where the children were now more open with her and more willing to share information about what their lives were like when living with Father and Mother. New testified that this included learning additional information from the children regarding Father's drug use, anger management, and "overall demeanor with the children," as well as with "money issues" that they faced while living with Mother and Father.

**{¶ 20}** New also explained that although Father was initially permitted to call and text message with the children, those privileges were later suspended due to Father's inappropriate conversations with the children. This included Father "sharing information about the case," which resulted in the children "always be[ing] really upset after the phone calls." New testified that there were also concerns Father was "trying to control the narrative through the children" by telling the children what to say. New testified that when confronted about these issues, Father ceased cooperating with WCCS, refused to submit to any more random drug screens, and violated the juvenile court's no contact order with the children.

**{¶ 21}** New further testified that the children had expressed concerns about their emotional well-being while living with Father and Mother. New testified that this included

https://www.sog.unc.edu/sites/www.sog.unc.edu/files/Sov%20citizens%20quick%20guide%20Nov%2013.pdf (last accessed Dec. 9, 2022).

- 9 -

one of the children engaging in self-harming behavior while in Father's and Mother's care. New testified that this also included the children reporting that Father would "get angry quickly" when dealing with "situations between him and their mom." New testified, however, that the children are now in therapy and have been engaged in some type of counseling since they were first placed in foster care. New also testified that, while making it known that they "definitely" want to maintain a relationship with Mother, the children have not expressed the same desire as it relates to Father.

{¶ 22} New testified that the children had also expressed "that they do not want to return home," that they "feel more safe and more comfortable in their foster home at this time," and that they "would prefer to stay with their foster parents." New testified that this was because the children knew of Father's and Mother's drug use, had seen drugs and drug paraphernalia, including needles, in the home, and witnessed "altercations" and "violence" between their parents. New testified that this was also because the children were concerned that Father would find a journal they used to document their lives while living with Father and Mother, a journal the children believed Father would not be happy about if its contents were ever disclosed to him or Mother.

{¶ 23} New additionally testified that "all the concerns that were at the beginning of the case are still a concern to [WCCS] because they haven't been addressed." New, in fact, testified that there were now even more concerns than were present at the beginning of the case given what had since come to light regarding Father. New also testified that, from WCCS' perspective, before any visitation time between Father and the children could resume "it would like him to submit to a drug screen, um, to show that he is currently sober. And we would like for him to start engaging in his services, um, which are the

recommendations of the psychological evaluation."  Thereafter, when asked whether she had seen any change in Father's behavior in the preceding two years that would make her feel comfortable putting the children back with Father, New testified, no, "[n]ot at this time."

*The Juvenile Court's Decision and Dependency Adjudication*

{¶ 24} On May 27, 2022, the juvenile court issued a decision again finding the children were dependent under R.C. 2151.04(C).  In so holding, the juvenile court noted that Father's psychological evaluation had returned recommendations concerning Father's substance abuse and anger management issues, Father's relationship troubles with both Mother and the children, as well as the negative impact that Father's behavior has had, and continues to have, on the children.  The juvenile court also noted that Father had been recommended to undergo mental health counseling, complete a domestic violence assessment, attend outpatient substance abuse treatment, submit to random drug screens, and enroll in an intensive parenting education program.  However, rather than following through with these recommendations, the juvenile court noted that, unfortunately, "Father's denial of any of these issues led to his decision not to engage in the recommendations for treatment and additional evaluations made by the CDC."

{¶ 25} In reaching this decision, the juvenile court initially noted:

> In turn this left Father unable to recognize a need for treatment and the need to address issues occurring in the home leaving the children vulnerable to instances of domestic abuse and illicit drug use.  Additionally, the surmisable inattentive parenting style of both parents caused the eldest child to assume the role as the responsible caregiver for her siblings.

{¶ 26} Continuing, the juvenile court noted:

> Further, Father has continuously failed to abide by orders from this Court, in particular, Father's no contact order with the Children.  Father admits to several violations of the no contact

- 11 -

order in which he would talk with the Children about the case and coach them on what to say. These contacts would leave the children upset and confused. The Children have made it clear that they do not want to live with their Father and fear returning to his care. The Children also fear they will become the subject of Father's abuse if he were to ever find out their true feelings authored in their private journal.

{¶ 27} Concluding, the juvenile court noted:

As summarized above, the condition and environment of the family home are affecting the children negatively and are detrimental to what otherwise should be a healthy childhood development. If these children were returned to Father's home, his untreated mental health issues, parenting problems, unrecognized domestic abuse, and untreated drug habit, would leave [these] children unprotected and vulnerable to harmful consequences of a pugnacious parent.

{¶ 28} On June 28, 2022, Father filed a notice of appeal from the juvenile court's decision adjudicating the children dependent under R.C. 2151.04(C). Father's appeal was submitted to this court for review on November 16, 2022. Father's appeal now properly before this court for decision, Father has raised five assignments of error for review.

**Father's Status as a Pro Se Litigant**

{¶ 29} Prior to addressing Father's five assignments of error, we find it necessary to note that litigants who appear pro se "are held to the same standard as litigants who are represented by counsel." *Jones v. Nichols*, 12th Dist. Warren No. CA2012-02-009, 2012-Ohio-4344, ¶ 23, citing *State ex rel. Leon v. Cuyahoga Cty. Court of Common Pleas*, 123 Ohio St.3d 124, 2009-Ohio-4688, ¶ 1. This means that pro se litigants, like Father, are presumed to have knowledge of the law and correct legal procedures so that he or she remains subject to the same rules and procedures to which represented litigants are bound. *Fikri v. Best Buy, Inc.*, 12th Dist. Warren No. CA2013-06-051, 2013-Ohio-4869, ¶ 12. Pro se litigants are also "not to be accorded greater rights and must accept the results of their

own mistakes and errors, including those related to correct legal procedure." *Cox v. Zimmerman*, 12th Dist. Clermont No. CA2011-03-022, 2012-Ohio-226, ¶ 21. This is because pro se litigants "are expected, as attorneys are, to abide by the relevant rules of procedure and substantive laws, regardless of their familiarity with the law." *Fontain v. H&R Cincy Props., LLC,* 12th Dist. Warren No. CA2021-02-015, 2022-Ohio-1000, ¶ 26.

**Assignment of Error No. 1:**

{¶ 30} THE COURT ERRED WHEN THE FACTS PRESENTED CONSTITUTE NO CLEAR AND CONVINCING EVIDENCE THAT, THE CHILDREN WERE DEPENDENT PURSUANT TO R.C. §2151.04(C) WHICH CONSTITUTE PLAIN ERROR. [sic].

{¶ 31} In his first assignment of error, Father argues the trial court erred by finding the state presented clear and convincing evidence that the children were dependent under R.C. 2151.04(C).[7] We disagree.

{¶ 32} "The state bears the burden of proof of establishing that a child is abused, neglected, or dependent." *In re L.H.*, 12th Dist. Warren Nos. CA2018-09-106 and CA2018-09-109 thru CA2018-09-111, 2019-Ohio-2383, ¶ 20. Pursuant to R.C. 2151.35(A), a juvenile court's adjudication of a child as abused, neglected, or dependent must be supported by clear and convincing evidence. *In re T.B.*, 12th Dist. Fayette No. CA2014-09-019, 2015-Ohio-2580, ¶ 12. "The Ohio Supreme Court has defined 'clear and convincing evidence' as '[t]he measure or degree of proof that will produce in the mind of the trier of

---

7. Father also argues within his first assignment of error that the juvenile court erred by granting temporary custody of the children to WCCS because it was not in the children's best interest. Father's appeal, however, is taken from the juvenile court's adjudication of the children as dependent, not from a dispositional order granting temporary custody of the children to WCCS. "[A] consideration of the 'best interests' of the child should not enter into the initial factual determination of dependency. It becomes a proper focus only when the emphasis has shifted to a consideration of the statutorily permissible dispositional alternatives." *In re Cunningham*, 59 Ohio St.2d 100, 107 (1979).

- 13 -

fact a firm belief or conviction as to the allegations sought to be established.'" *In re J.B.*, 5th Dist. Stark Nos. 2022CA00086 thru 2022CA00088, 2022-Ohio-3895, ¶ 22, quoting *In re Estate of Haynes*, 25 Ohio St.3d 101, 104 (1986).

**{¶ 33}** "'Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 21, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). "An appellate court's review of a juvenile court's decision finding clear and convincing evidence is limited to whether there is sufficient, credible evidence in the record supporting the juvenile court's decision." *In re J.Q.*, 12th Dist. Preble No. CA2020-02-003, 2020-Ohio-4507, ¶ 8. Therefore, given such limited review, this court will not reverse a juvenile court decision finding the existence of clear and convincing evidence "unless there is a sufficient conflict in the evidence presented."[8] *In re M.W.*, 12th Dist. Butler No. CA2017-01-011, 2017-Ohio-7358, ¶ 12.

**{¶ 34}** Pursuant to R.C. 2151.04(C), a "dependent child" means any child "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]" "R.C. 2151.04(C) is to be applied broadly to protect a child's health, safety, and welfare." *In re M.W.*, 12th Dist. Warren Nos. CA2020-03-018 and CA2020-03-019, 2021-Ohio-1129, ¶ 13. "'The determination that a child is dependent

---

8. We note that Father claims a plain error analysis applies when reviewing a juvenile court's adjudication of a child as dependent under R.C. 2151.04(C). Father is incorrect. Father is also incorrect in his assertion that Juv.R. 40(D)(3)(b)(ii) applies to this case. Juv.R 40(D)(3)(b)(ii) requires an objection to a magistrate's decision be specific and state with particularity all grounds for objection. There was no magistrate decision issued in this case. The decision on appeal was issued by the juvenile court judge.

requires no showing of fault on the parent's part.'" *In re S.W.*, 12th Dist. Brown No. CA2011-12-028, 2012-Ohio-3199, ¶ 12, quoting *In re Bolser*, 12th Dist. Butler Nos. CA99-02-038 and CA99-03-048, 2000 Ohio App. LEXIS 260, *10-*11 (Jan. 31, 2000). "Rather, the focus is on the child's condition or environment and whether the child was without adequate care or support." *In re Y.R.*, 12th Dist. Warren No. CA2020-09-057, 2021-Ohio-1858, ¶ 46.

{¶ 35} "Thus, dependency under R.C. 2151.04(C) requires 'evidence of conditions or environmental elements that were adverse to the normal development of the child.'" *In re N.J,* 12th Dist. Warren Nos. CA2016-10-086, CA2016-10-090, and CA2016-10-091, 2017-Ohio-7466 ¶ 19, quoting *In re E.R.*, 9th Dist. Medina No. 05CA0108-M, 2006-Ohio-4816, ¶ 13. "However, a court may consider a parent's conduct insofar as it forms part of the child's environment." *In re A.P.*, 12th Dist. Butler No. CA2005-10-425, 2006-Ohio-2717, ¶ 27. "A parent's conduct is significant if it has an adverse impact on the child sufficient to warrant state intervention." *Id.*, citing *In re Ohm*, 4th Dist. Hocking No. 05CA1, 2005-Ohio-3500, ¶ 21, "'That impact cannot be simply inferred in general, but must be specifically demonstrated in a clear and convincing manner.'" *In re A.P.*, 12th Dist. Warren No. CA2022-01-002, 2022-Ohio-3181, ¶ 13, quoting *In re Burrell*, 58 Ohio St.2d 37, 39 (1979).

{¶ 36} Father initially argues the juvenile court erred by adjudicating the children as dependent under R.C. 2151.04(C) because "the state failed to prove the substance abuse issues had an adverse impact on the children to warrant state intervention." However, although we agree with Father that the state is not warranted in assuming guardianship of a child based upon a parent's use of an illegal substance or the abuse of a legal substance without clear and convincing evidence that a parent's drug use has an actual adverse impact on the child, the facts underlying the juvenile court's decision to adjudicate the

children as dependent extends well beyond just Father's and Mother's past (and potentially still present) substance abuse issues. The juvenile court's decision was also predicated on, among other things, concerns regarding Father's untreated mental health issues, inattentive parenting style, unrecognized domestic violence, and unresolved anger management issues. The juvenile court found that returning the children to Father's care under these circumstances without Father first addressing these issues "would leave [these] children unprotected and vulnerable to harmful consequences of a pugnacious parent." There is sufficient clear and convincing evidence to support the juvenile court's decision. Father's claim otherwise lacks merit.

{¶ 37} Father also argues the juvenile court erred by adjudicating the children as dependent under R.C. 2151.04(C) because the testimony and evidence offered by WCCS caseworker New was "not trustworthy." To support this claim, Father argues New's testimony conflicts with the "prior evidence" that she offered at the original adjudication hearing held on October 21 and 28, 2020 and "does not constitute a clear and convincing evidenced (sic)." However, although couched in slightly different terms, Father's argument is nothing more than a challenge to the juvenile court's decision finding New's testimony credible.

{¶ 38} We defer to the juvenile court on issues of credibility, which we will not second-guess on appeal. *In re L.S.*, 12th Dist. Warren Nos. CA2017-11-157 and CA2017-11-160, 2018-Ohio-1981, ¶ 29; *In re G.T.*, 8th Dist. Cuyahoga No. 110936, 2022-Ohio-1406, ¶ 25. This is because "much may be evident in the parties' demeanor and attitude that does not translate well to the record." *In re L.C.*, 12th Dist. Warren No. CA2019-08-086, 2020-Ohio-4629, ¶ 16, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 419 (1997). This is

particularly true in matters involving children. *In re P.C.*, 3d Dist. Logan Nos. 8-20-39 thru 8-20-41 and 8-20-45 thru 8-20-47, 2021-Ohio-1238, ¶ 35.

{¶ 39} Father further argues the juvenile court erred by adjudicating the children as dependent under R.C. 2151.04(C) because much of the testimony elicited from New constituted inadmissible hearsay that should not have been relied upon by the juvenile court in issuing its decision. Father, however, objected to New's testimony on hearsay grounds just once, an objection that the juvenile court sustained. Therefore, by failing to raise a hearsay objection to more than just that one out-of-court statement, Father has waived all but plain error to any portion of New's testimony that he did not raise an objection. *See State v. Grimm*, 12th Dist. Clermont No. CA2018-10-071, 2019-Ohio-2961, ¶ 9 (appellant waived "all but plain error as to those statements to which he did not object" when arguing the trial court erred by admitting alleged hearsay statements from a police officer and two nurses for which appellant objected to only "some" of those challenged statements).

{¶ 40} "Plain error in the civil context is 'extremely rare' and this court must find that the error involves 'exceptional circumstances' where the error 'rises to the level of challenging the legitimacy of the underlying judicial process itself.'" *In re J.W.*, 12th Dist. Butler Nos. CA2017-12-183 and CA2017-12-184, 2018-Ohio-1781, ¶ 13, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122 (1997). "The doctrine implicates errors that are 'obvious and prejudicial although neither objected to nor affirmatively waived which, if permitted, would have a material adverse affect on the character and public confidence in judicial proceedings.'" *In re J.M.*, 12th Dist. Butler Nos. CA2018-06-124 and CA2018-06-125, 2019-Ohio-3716, ¶ 14, quoting *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209 (1982). "[W]here a party fails to expressly raise a claim of plain error on appeal, we need

not consider whether plain error exists." *In re A.V.*, 2021-Ohio-3878 at ¶ 35, citing *In re K.P.R.*, 197 Ohio App.3d 193, 2011-Ohio-6114, ¶ 10 (12th Dist.).  Such is the case here.

**{¶ 41}** Although Father did argue that a plain error analysis applies when reviewing a juvenile court's adjudication of a child as dependent under R.C. 2151.04(C), Father did not argue that it was plain error for the juvenile court to admit otherwise inadmissible hearsay statements that may have been elicited from New in this case.  Father is therefore precluded from raising this issue on appeal.  This would hold true even if Father had raised a plain error argument in either of the two reply briefs he filed in this case.  This is because "[t]he reply brief is merely an opportunity to reply to the brief of the appellee, and is not to be used by an appellant to raise new assignments of error or new issues for review."  *See State v. Leach*, 12th Dist. Clermont No. CA2000-05-033, 2001 Ohio App. LEXIS 584, *30, fn. 3 (Feb. 20, 2001); and App.R. 16(C) ("[t]he appellant may file a brief in reply to the brief of the appellee * * *").  Accordingly, Father has forfeited this issue on appeal.

**{¶ 42}** Father additionally argues the juvenile court erred by adjudicating the children dependent under R.C. 2151.04(C) because "the children" indicated in a text message that they wanted to live with Father and would prefer living with Father rather than in a foster home.  However, even if we were to assume the record supported Father's claim that it was all four of the children who had written this text message, which it does not, where the children would prefer to live is immaterial to the question of whether there was clear and convincing evidence that the children were dependent under R.C. 2151.04(C).  The children's wishes would only become relevant at disposition when the juvenile court is tasked with determining which of the six dispositional alternatives enumerated in R.C. 2151.353(A)(1) through (A)(6) would be in the children's best interest.  *See In re Y.R.*, 2021-

Ohio-1858 at ¶ 67; and R.C. 3109.04(F)(1) (listing "the child's wishes and concerns" as one of the factors the juvenile court is to consider when determining the best interest of a child). To the extent Father claims otherwise, Father's argument lacks merit.

{¶ 43} Father finally argues the juvenile court erred by adjudicating the children dependent under R.C. 2151.04(C) because the copy of his psychological evaluation admitted into evidence was not the original signed copy. However, as the record indicates, the only reason the original signed copy was not available was because Father stole that copy from CDC's office. Father cannot benefit from his own criminal conduct. Any suggestion Father makes to the contrary lacks merit. So too does Father's claim that his psychological evaluation has no "legal backing" following the release of this court's decision in *In re A.V.*, 2021-Ohio-3878. The same holds true as it relates to Father's claim that all juvenile court's orders made prior to the release of *In re A.V.* are "null and void," lacking any legal or "practical effect," and "barred by mootness." Such a claim lacks support in both the facts and the law. Therefore, because we find no merit to any of the arguments raised by Father herein, Father's first assignment of error lacks merit and is overruled.

**Assignment of Error No. 2:**

{¶ 44} THE COURT ERRED BECAUSE NONCOMPLIANCE WITH SERVICE OF PROCESS GOES TO THE JUVENILE COURT'S JURISDICTIONAL AUTHORITY, AND IT AFFECTS THE POWER OF THE COURT.

{¶ 45} In his second assignment of error, Father argues the juvenile court lacked jurisdiction to adjudicate the children dependent under R.C. 2151.04(C) because he was not properly served with WCCS' complaint filed with the juvenile court on March 8, 2022. Father also argues it was not proper for the juvenile court to adjudicate the children as

dependent because he was not properly notified of the juvenile court's emergency shelter care hearing held on March 25, 2022. The record in this case, however, does not support Father's claims. The record instead firmly establishes that Father was served with both WCCS' complaint, as well as notice of the juvenile court's emergency shelter care hearing, in accordance with the law. The record indicates the juvenile court, in fact, went above and beyond what the law required to notify Father of the emergency shelter care hearing via telephone and e-mail prior to that hearing taking place. Therefore, despite Father's claims, the fact that Father failed to appear at the juvenile court's emergency shelter care hearing was not the result of any lack of notice from the juvenile court as to when and where that hearing would take place. Accordingly, finding no merit to any of Father's arguments raised herein, Father's second assignment of error lacks merit and is overruled.

**Assignment of Error No. 3:**

{¶ 46} THE MARCH 8, 2022, COMPLAINT IS NOT VALID, AND THE COURT HAS EXCEEDED ITS AUTHORITY WHICH CONSTITUTED A CLEAR AND PLAIN ERROR. [sic].

{¶ 47} In his third assignment of error, Father argues the juvenile court erred by failing to hold an adjudicatory hearing no later than 60 days after the date on which WCCS' complaint as required by R.C. 2151.28(A)(2). However, although we agree with Father's claim that the adjudicatory hearing in this case was held more than 60 days after the date on which WCCS' filed its complaint, given the language set forth in R.C. 2151.28(K), "it is well established that a failure to conduct an adjudicatory hearing within the 60 day time limit prescribed in R.C. 2151.28(A)(2) does not deprive the juvenile court of the right to enter an

- 20 -

adjudication."[9] *In re J.J.*, 8th Dist. Cuyahoga No. 86276, 2007-Ohio-535, ¶ 26; *In re Bailey D.*, 6th Dist. Lucas No. L-96-363, 1998 Ohio App. LEXIS 1571, *5 (Apr. 17, 1998) ("the failure to comply with the sixty day time limit for holding an adjudicatory hearing does not deprive the juvenile court of the right to enter an adjudication"). This holds true even though WCCS had filed an earlier complaint on November 21, 2021, a complaint that WCCS subsequently dismissed, that also alleged the children were dependent under R.C. 2151.04(C) based on similar facts to the case at bar. Father's claim otherwise lacks merit. Therefore, finding no merit to any of Father's arguments raised herein, Father's third assignment of error lacks merit and is overruled.

**Assignment of Error No. 4:**

{¶ 48} THE NOVEMBER 21, 2021, AND MARCH 8, 2022, COMPLAINTS ARE BARRED DUE TO STATUTE OF LIMITATION AND CONSTITUTE CLEAR AND PLAIN ERRORS. [sic].

{¶ 49} In his fourth assignment of error, Father makes a confusing argument seemingly alleging the juvenile court could not adjudicate the children as dependent under R.C. 2151.04(C) due to a violation of some unknown, unidentified "statute of limitation" regarding both the complaint WCCS filed with the juvenile on March 8, 2022, as well as the earlier complaint WCCS filed with the juvenile court on November 21, 2021 and subsequently dismissed. To support this claim, Father again cites R.C. 2151.28(A)(2) and the requirement set forth within subsection (A)(2)(b) that mandates a juvenile court hold an adjudicatory hearing no later than 60 days after the date on which a dependency complaint

---

9. Pursuant to R.C 2151.28(K), a juvenile court's failure to hold an adjudicatory hearing within the applicable 60-day timeframe prescribed by R.C. 2151.28(A)(2) "does not affect the ability of the court to issue any order under this chapter and does not provide any basis for attacking the jurisdiction of the court or the validity of any order of the court."

has been filed. However, given our resolution of Father's third assignment of error, Father's arguments raised within his fourth assignment of error also lack merit. Therefore, finding no merit to any of the arguments raised by Father herein, Father's fourth assignment of error is overruled.

**Assignment of Error No. 5:**

{¶ 50} THE TRIAL COURT ERRED BY NOT APPLYING DUE PROCESS TO FATHER/APPELLANT'S FUNDAMENTAL RIGHT TO THE CARE, CUSTODY, AND CONTROL OF HIS CHILDREN AFTER THE 12TH DISTRICT COURT OF APPEAL JUDGMENT VACATING THE JUVENILE COURT DECISION AND THEREFORE, CONSTITUTES A CLEAR AND PLAIN ERROR. [sic].

{¶ 51} In his fifth assignment of error, Father argues he was denied due process when the children were not immediately returned to his custody after this court issued its decision in *In re A.V.*, 2021-Ohio-3873. However, upon review, we can find nothing within *In re A.V.* that would indicate Father was entitled to have the children immediately returned to his care and custody upon the release of that opinion. This court's decision in *In re A.V.* merely reversed and vacated the juvenile court's decision adjudicating the children dependent under R.C. 2151.04(C) upon finding the record in that case "devoid of any evidence demonstrating that Mother's and Father's drug use had an adverse impact on their children, and "[w]ithout some evidence that the children's environment has been affected in some negative way by Mother's and Father's drug use, there is no clear and convincing evidence of dependency." *Id.* at ¶ 28. Therefore, because we find no merit to any of the arguments raised by Father herein, Father's fifth assignment of error is overruled.

## Conclusion

{¶ 52} For the reasons outlined above, and finding no merit to any of the arguments advanced by Father herein in support of any of his assignments of error, Father's five assignments of error are overruled.

{¶ 53} Judgment affirmed.

M. POWELL, P.J., and PIPER, J., concur.